H. VON PACKARD and SHEILA D. PACKARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Von Packard v. Commissioner
Docket No. 9526-80.
United States Tax Court
T.C. Memo 1983-681; 1983 Tax Ct. Memo LEXIS 109; 47 T.C.M. (CCH) 302; T.C.M. (RIA) 83681; November 14, 1983. Ronald D. Packard, for the petitioners. Eileen Kato Player, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent determined a deficiency of $7,159 in petitioners' income tax for 1976. At issue is whether petitioners are entitled to a theft loss deduction for their 1976 taxable year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Santiago, Chile, when their petition in this case was filed. Sheila D. Packard is a party herein solely by virtue of having signed the joint return, and H. Von Packard will hereinafter be referred to as petitioner. In December 1971, a group of investors (hereinafter the Packard group) comprising *110 petitioner, Ronald C. Packard, Floyd L. Packard, Jay L. Packard, Jan Prahm, Robert D. Lewis, Lowell C. Lundell and John B. Schoenfeld, purchased Quimby Island, a 983 acre island located in the Sacramento Delta area of California. The total purchase price was $395,000, paid as follows: $145,000 cash; $200,000 loan from Equitable Life Assurance Society, secured by a note and first deed of trust, signed by each member of the Packard group; $35,000 purchase money loan from seller, secured by a note and second deed of trust, signed by each member of the Packard group; $15,000 purchase money loan from seller for farm equipment, secured by a chattel mortgage on farm equipment. With its purchase of Quimby Island the Packard group acquired a dormant Reclamation District, Reclamation District No. 2090, County of Contra Costa, California, which was chartered in 1956 pursuant to the California Water Code as a Special District of the State of California. On February 24, 1972, the Packard group leased Quimby Island, with an option to purchase, to Aquatic Innovations, Inc. (hereinafter Aquatic Innovations). On April 11, 1972, the Board of Supervisors of Contra Costa County, California, *111 appointed Lowell C. Lundell, Robert D. Lewis, and John B. Schoenfeld as trustees of Reclamation District 2090. On April 21, 1972, the Board of Trustees of Reclamation District 2090 appointed Max Mortensen (hereinafter Mortensen) general manager of the Reclamation District. In November 1972, several members of the Packard group, including petitioner, retained Frank Lee Crist, Jr. (hereinafter Crist) as counsel because they believed the president of Aquatic Innovations, Marshall E. Cornblum (hereinafter Cornblum), was attempting to encumber the Quimby Island property with debts for which the Packard group would be liable. A letter dated December 4, 1972, from Crist to Cornblum read as follows: Dear Mr. Cornblum: The trustees of Quimby Island Reclamation District No. 2090 held a meeting on November 30, 1972 and transacted the following business: 1) Rescinded the actions of the Board of Directors of all business transacted at the Board meetings of April 21, 1972 and November 4, 1972. 2) Terminated the services of Max Mortensen in the capacity of General Manager and agreed to authorize his services in the capacity of a consultant. 3) Elected a new Board of Trustees consisting *112 of the following: Jay L. Packard
President
Jan Prahm
Treasurer
John B. Schoenfeld
Secretary
4) Bank accounts. Terminated the present power of the current signatures to execute checks and required signatures of two of the three turstees in order to execute checks. 5) Indebtedness of the district. Prior to any indebtedness of the district, a vote of two of the three trustees at a regularly scheduled meeting must occur. 6) Accounting. The Board directed that its former General Manager, Mr. Mortensen, immediately account for all funds spent by the district together with accounting of all income received. 7) The owner of the property agreed to list the property for sale. 8) The Board of Trustees agreed to reconvey all property back to the owner which had been conveyed by the owner previously. Would you kindly forward to me a copy of the articles and bylaws of the Reclamation District, together with any other documents pertaining to the Reclamation district. I would appreciate hearing from you any proposal that Aquatic Innovations, Inc. may have. Thank you for your courtesy. Very truly yours, CRIST, CRIST, GRIFFITHS & BRYANT /S/ *113 Frank Lee Crist, Jr. Frank Lee Crist, Jr. By letter dated December 29, 1972, Cornblum replied: Dear Mr. Crist: On December 11, 1972, I received your letter dated December 4, 1972, with respect to certain alleged actions taken by Board of Trustees of Reclamation District No. 2090. Please be advised that, on behalf of my client, Aquatic Innovations, Inc., I deem the alleged actions therein set forth to be illegal, void and of no force and effect. Very truly yours, /S/ Marshall Cornblum MARSHALL CORNBLUM OF THIEL, BOLTON & CORNBLUM Also by letter dated December 29, 1972, Cornblum advised the Packard group that Aquatic Innovations elected to exercise its option to purchase Quimby Island. Crist discussed Cornblum's offer in a letter to the Packard group dated February 2, 1973, which read in pertinent part as follows: We have two basic alternatives, (1) we can file a lawsuit in order to "quiet title" to our property, namely terminate all leases and rights of A.I.I. [Aquatic Innovations, Inc.] and render the property free and clear so that you can sell it to a new purchaser, and (2) the other alternative is to pursue a sale with A.I.I., the terms of which will *114 most likely be on a long-term payout as opposed to cash. Considering the first alternative, that of a quiet title suit, my opinion is as follows: 1) I believe that you have a good case to win the quiet title suit for the following reasons: * * * The other alternative is to attempt to try to work out a sale with A.I.I., so that you can either cash yourselves out completely (in my opinion this is highly doubtful at this time) or proceed with the sale on the terms set forth in the lease option agreement, provided your security interest is cleaned up as I will suggest in a minute.
Pursuant to the option agreement, you would receive $105,000 in cash on February 13. You would further receive a rebate for the amounts paid to the first deed of trust, Equitable Life, and to Ruth Kofod on the second. You would then receive a $544,000 promissory note which would be secured by 690 acres, with 140 acres being released free and clear of your lien to the purchaser. You would receive annual interest on December 24 of each year, with principal due and payable December 24, 1977. You would not have to subordinate your lien to any improvement bonds or release any lot sites because of the *115 refusal to the County to allow the lot subdivisions. In order to adequately protect your security, the following would have to be done: 1) You would have to receive a reconveyance from the Reclamation District of the 20-ft. perimeter strip on the secured 690-acre parcel. 2) The A.I.I. lease to the perimeter boat slips on your 690-acre parcel would have to be terminated. 3) The Reclamation District would have to enter into an agreement with the owners of the secured instrument, namely you, that the Reclamation District could not by their actions encumber your parcel, so that all bonds that would be floated by the Reclamation District would encumber only the 140-acre parcel. This agreement would have to be recorded and I have checked with the State Reclamation District today and this would be valid and prevent the Reclamation District from endangering your parcel or your security. I would further advise that if you want to consider proceeding on a purchase that we present an alternative all cash offer and that we further make a demand that they perform within 30 days; and that if you do wish to proceed with a sale to A.I.I., that we take the position that the Lessee does *116 not have any present option rights and that we are commencing brand new negotiations to sell the property to the Lessee. * * * My conclusion would be that a sale along the lines that I have suggested, if it could be accomplished, would make the most sense. However, Jan Prahm has pointed out an exceedingly good point, and that is that the price for the remaining 690 acres, in the event you were to have to take the property back, would be substantially less per acre than the price per acre that could be charged if you owned the entire island. I can't comment on this economic factor. Finally, we need to make an immediate decision. I am going to leave on vacation for 10 days on Thursday, February 8, and I would like to render Cornblum notice of our intent prior to February 13, which means I would like to give him notice no later than next Thursday. Very truly yours, CRIST, CRIST, GRIFFITHS & BRYANT /S/ Frank Lee Crist, Jr. Frank Lee Crist, Jr. On February 14, 1973, Mortensen wrote to the Packard group describing his activities and offering his views on the proposed sale, as follows: I was authorized to function as General Manager by the Board of Trustees approved *117 by the Contra Costa County Board of Supervisors. Now, as a consultant, I must advise you of the serious situation pertaining to Quimby Island. In my capacity as general manager I was authorized by resolution to direct the maintenance and development of this property. Payment of services and fees for materials and other expenditures were to be made from the proceeds of the sale of improvement bonds.There are approximately seventy outstanding creditors of the District and no funds to pay for their billings. Due to the position you have taken, the sale of these bonds cannot be effected to satisfy these claims. I have only recently discovered that * * * several of the investors have been attempting to sell the island while a valid escrow exists for a lease option to purchase the island. Aquatic Innovations, Inc. exercised their option to purchase in accordance with the existing agreement. These actions on the part of those involved have jeopardized the closing of the sale escrow and caused serious delays. These delays have caused several of the creditors to take legal action against the District and I am sure that many more will follow suit. Law suits by these creditors will seriously *118 effect the development and also cause a time delay and added expense. The net effect would be a prolonged litigation involving the island. Depreciation of all work accomplished to date would occur. It appears that a meeting should be held and all problems resolved once and for all before serious damage to the development potential occurs and the island reverts back again to its original state. This would only cause a loss of "potential" profits to all concerned. The work already accomplished was necessary to appreciate the value of the island and, providing all can be satisfied with a reasonable profit, the development can go forward. Otherwise, I cannot assure you as investors, that a reasonable profit can be realized. Enclosed please find a list of the current payables now past due. In closing, I would like to add, I have not received any consideration for the preceeding four months and I have continued to do all the work necessary to protect this property from Flooding, vandalism and all other problems arising from absentee ownership. In addition, I am working with the engineers for the final detailed plans that must be submitted to the State Reclamation Board. I *119 cannot emphasize enough, the need for better communications and cooperation between the two groups party to a legal, binding, contract made so by the signatures of all involved. Sincerely, /S/ Max Mortensen Max Mortensen On March 30, 1973, the Packard group and Aquatic Innovations entered into a joint irrevocable escrow agreement specifying the terms under which Aquatic Innovations would buy, and the Packard group sell, Quimby Island. The close of escrow was to be no later than July 15, 1973. In May 1973, the Board of Trustees of Reclamation District 2090 formed the Quimby Island Reclamation District Facilities Corporation (hereinafter Facilities) for the purpose of issuing tax-free bonds. Aquatic Innovations failed to meet the required terms of its escrow agreement with the Packard group by the required deadline. By letter dated August 10, 1973, to the Commissioner of Internal Revenue, a law firm requested on behalf of Facilities a ruling that interest on bonds to be issued by Facilities would not be includable in the gross income of payees. The "Facts" section of the ruling request included representations that: On October 27, 1972, the Reclamation Board of the *120 State of California approved the District's Reclamation Plan (the "Plan"). Under the Plan the District is to acquire all of the land which comprises Quimby Island ("Island"). The Island contains about 800 acres and is in the Sacramento-San Joaquin Delta area of Contra Costa County, California. When the land on the Island is acquired there will be constructed certain improvements consisting of a public sewage collection, treatment and disposal system, a public water production, treatment and distribution system, facilities for the local furnishing of electrical energy, certain public transportation easements (traffic on the Island is to be restricted to pedestrian traffic, bicycles and self-powered vehicles comparable to golf carts), and other improvements such as bulkheading, compacting and landscaping the levee which extends around the perimeter of the Island. * * * Pursuant to the Plan, when the improvements have been added the Island and its environs will be used by the general public for recreational and educational activities. * * * The District is now in the process of acquiring from the present owners thereof all of the land which comprises the Island. It is anticipated *121 that sufficient land will have been acquired by September 1, 1973, to permit the first phase of construction to begin. Pursuant to the Plan, the District will lease said property to Quimby Facilities which will construct the improvements thereon. The lease is for a term of 30 years. * * * On August 24, 1973, the Packard group attempted to break off further negotiations with Cornblum and Aquatic Innovations for the sale of Quimby Island, and placed an advertisement in the Wall Street Journal, advising that Quimby Island was for sale. Mortensen, acting on behalf of Reclamation District 2090, on October 3, 1973, presented to the Packard group an offer for the purchase of Quimby Island. He stated to them that they could never understand the proposed transaction in a hundred years, but that it was entirely legal, that the purchaser was an insurance company from Southern California, that Cornblum would not be involved in the transaction, that the note and deed of trust to be received back by the Packard group would be secured, and that any bonds subsequently issued by the Reclamation District would be subordinate to the note and deed of trust received by the Packard group. Jay *122 L. Packard, petitioner's brother, attended and tape recorded the October 3, 1973 meeting. He sent the tape to petitioner, who heard and relied on the representations made by Mortensen. On or about October 30, 1973, the Packard group entered into an agreement to sell Quimby Island to Cambridge insurance Services, Inc., or nominee, for a sum of $780,000. The terms of the sale were as follows: $350,000 down payment, assumption of existing first and second deeds of trust, and a purchase money note in the amount of $210,000 secured by a third deed of trust. The actual purchaser of Quimby Island was Reclamation District 2090. Facilities was made liable on the $210,000 note. A partnership return in the name of Quimby Island Associates was filed for 1973 in which a gain to the partnership was reported from the sale of Quimby Island. On his 1973 Federal income tax return, petitioner reported his proportionate share of the partnership's gain on the sale of Quimby Island. The first payment from Facilities on the $210,000 note was due in December 1974. On or about December of 1974, Mortensen informed the Packard group that no payment on the note would be forthcoming. By letter dated *123 December 14, 1976, Blaine Morley, acting as counsel to Jan Prahm, Jay, Ronald, and Floyd Packard, and petitioner, wrote to Crist demanding that Crist pay the amounts owing on the $210,000 note of Facilities. The letter read in part as follows: As you are no doubt aware, we have been retained by Jay Packard, his brothers and Jan Prahm to represent them in respect to the difficulties they have experienced in their futile attempts to collect on the debt obligations delivered to them in connection with the sale of that property to the Quimby Island Reclamation District No. 2090 with respect to which you represented them. Our representation does not include that of Drs. Lewis, Lundell or Schoenfield. After the representation of the group who we now represent was transferred from your office to ours, we filed an action for a judicial foreclosure of the deed of trust. Shortly before the trial date, we discovered that the District had issued its general obligation securities which would, in the event of foreclosure, have encumbered the land to the extent of the issuance. Though the exact amount of those general obligation securities has not been determined to date by anyone, from all *124 indications and investigations made by us, the Securities & Exchange Commission and by reference to the supporting schedules filed with the U.S. District Court in connection with the bankruptcy of Quimby Island Reclamation District, it appears that the amount exceeds $9,000,000. Based on our own research and the advice of bonding counsel, we have determined that were our clients to have taken possession of the island by virtue of a foreclosure of its deed of trust, the land would have been subject to all of those obligations and they, of course, would have had to pay taxes sufficient to support that debt load, which, of course, renders the property valueless. * * * When those facts became evident, our clients instructed us to make an investigation of the facts attendant to your representation of them in connection with the sale of the property to the District. In connection therewith, we discovered several areas wherein we question that you and your office exercised reasonable diligence and judgment in advising them to sell to Quimby Island Reclamation District under the circumstances that were accomplished. Included in the specifications of negligence on your part were: *125 1.You were specifically and repeatedly asked whether the District had the power to subsequently encumber the island in such a way that it could impair the value or the priority of the seller's purchase money deed of trust. Your repeated assurances were either in the negative or that you did not know, but would investigate the matter and advise them. There is no indication in the record that we have been able to examine that you ever undertook to or did advise them properly with respect to that issue. In point of fact, the District did encumber the island with some Nine Million Dollars, more or less, of general obligations whose priority is ahead of that of their deed of trust. 2. After you had undertaken the representation of our clients, it appears that you and Max Mortensen made a deal whereby you agreed to accept your compensation from the purchaser and were in fact paid the amount of $10,000 at or after the close of escrow by the Quimby Island Reclamation District. Not until after the close of escrow did you disclose that fact to your clients. * * * Accordingly, demand is hereby made on you that you or your insurer make arrangements for payment to this firm for the *126 benefit of all of the beneficiaries of the deed of trust above mentioned and the payees of the unsecured promissory note delivered after the close of escrow except Drs. Lewis, Lundell and Schoenfield, on or before December 31, 1976, the sum of $231,765.62, which consists of their 75% share of the unpaid principal balances, accrued interest thereon and attorneys' fees expended by them in the collection effort expended to date and in our representation with respect to the filing of this claim with you. Settlement must also include your agreement to indemnify our clients for any other damages suffered by them as a result of this transaction * * * On February 15, 1977, petitioner, Jay L. Packard, Jan Prahm, Floyd Packard and Ronald C. Packard filed a petition in the Superior Court of the State of California, County of Santa Clara, in which they alleged that Crist had acted negligently in his representation of the aforementioned plaintiffs regarding the sale of Quimby Island, thereby damaging the plaintiffs, and prayed for judgment against Crist in the amount of $209,322.70 for special damages and $500,000 for general damages, plus interest, attorney's fees and costs of suit. On February 20, 1980, the *127 aforementioned plaintiffs filed an amended petition wherein they reaffirmed the allegations of the original petition and additionally alleged that as a result of the wrongful acts of Crist they had been sued in various actions, placing in controversy approximately $5,000,000. The aforementioned plaintiffs prayed the court to require Crist to indemnify them for any liability arising out of the various legal actions, and to assess Crist for costs of defending such suits. On October 17, 1980, the plaintiffs again amended their petition, and prayed for indemnification from Crist for $53,000 paid in a settlement of one of the aforementioned law suits. At various times after the filing of the petition in the suit against Crist, the plaintiffs, including petitioner, offered to drop their claim for special and general damages if Crist would agree to indemnify them for any liability arising out of the various actions brought against them. In December 1977, Reclamation District 2090 filed for bankruptcy. In that bankruptcy action the Packard group filed a petition for order allowing filing of alternative proof of claim relating to the third deed of trust on Quimby Island in the amount *128 of $210,000. On February 10, 1978, the Packard group consented to a bankruptcy plan in exchange for release of all claims held against them by the Reclamation District 2090. Such plan provided for the subordination of the Packard group's claims to the claims of the general creditors of Reclamation District 2090. The Packard group filed its claim in the Reclamation District 2090 bankruptcy proceedings solely to establish for purposes of its suit against Crist that it had exhausted all avenues of recovering on the note from Facilities. Sometime after February 15, 1977, petitioner was sued in the following actions for his role in the sale of Quimby Island: Nelson v. Quimby Island Reclamation District Facilities Corporation, filed in the United States District Court for the District of Nevada; Bild, et al v. Nelson, et al, filed in the Superior Court of California for the City and County of San Francisco; Burke v. Schreiner, filed in the Superior Court of California for the City and County of San Francisco, and Kofod v. Packard, et al, filed in the Superior Court of California for the County of Sacramento. The various plaintiffs in these suits sought damages of *129 between $9 and $11 million from petitioner and various other defendants. OPINION Section 165[1] provides in pertinent part that there shall be allowed as a deduction any loss sustained during the taxable year not compensated for by insurance or otherwise. Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. Sec. 165(a) and (e). Section 1.165-1(d)(3), Income Tax Regs., which we have held valid, Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975), places a further condition upon the deductibility of theft losses: (3) Any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss (see sec. 1.165-8, relating to theft losses). However, if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, *130 for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received. [Sec. 1.165-1(d)(3), Income Tax Regs.] Thus, if petitioner had a claim, either against the buyers of Quimby Island or against a responsible third party, that offered in 1976 a reasonable prospect of recovery, such year was not the proper one in which to claim the theft loss. Ramsay Scarlett & Co. v. Commissioner,supra at 807. The burden of proving the existence of a theft, and the absence of a claim for reimbursement holding out a reasonable prospect of recovery, is upon petitioner. Rule 142(a). Petitioner contends that he suffered a theft loss in 1973 when the Packard group, of which he was a member, sold Quimby Island; that he discovered such loss *131 in 1976, and that there then existed no claim for reimbursement of his loss with respect to which there was a reasonable prospect of recovery. Respondent contends that petitioner suffered no theft loss from the sale of Quimby Island, and that in 1976 there existed a claim for reimbursement of petitioner's loss that offered a reasonable prospect of recovery. Because we agree with respondent's second contention, we have not found it necessary to determine whether petitioner suffered a theft loss within the intendment of section 165 from the sale of Quimby Island. Determining whether taxpayers had a claim for reimbursement that provided a reasonable prospect for recovery is an objective inquiry requiring an examination of all relevant facts and circumstances. In making such a determination, "[t]he fact that taxpayers filed a lawsuit to recover the deducted loss gives rise to an inference that they had such a claim." Dawn v. Commissioner,675 F.2d 1077, 1078 (9th Cir. 1982), affg. a Memorandum Opinion of this Court. Petitioner admits that in or before 1976, he and other *132 members of the Packard group retained counsel to pursue their claims against Crist, the attorney who allegedly had negligently represented them in the sale of Quimby Island, and that on February 15, 1977, he and other members of the Packard group brought suit against Crist seeking reimbursement for the losses they suffered when Facilities defaulted on its note. [2]
Petitioner contends, however, that he had no expectation in 1976 of recovering any amount from Crist, and that he and the other plaintiffs pursued their suit against Crist solely because they feared liability from various suits brought against them by the holders of Quimby Island Reclamation District Facilities Corporation bonds, and hoped to force Crist to indemnify them against any liability to the bondholders. Petitioner presented evidence suggesting that the bondholders sought damages of between $9 and $11 million from the Packard group. Under these circumstances, it is *133 understandable that petitioner was more concerned with his potential liability to the bondholders than with recovering from Crist the amount defaulted by Facilities. It does not follow that in 1976 petitioner had no reasonable prospect of recovering from Crist his loss from the default of Facilities, for the fact that the main goal of the litigation against Crist was to force him to indemnify the Packard group against the bondholders does not entail that petitioner did not have a subsidiary goal of recovering from Crist the amount defaulted by Facilities. Petitioner did offer to drop his claims for reimbursement if Crist would agree to indemnify him against the bondholders, but we note that through at least 1980 petitioner continued to seek full reimbursement from Crist. Although petitioner made no effort to inform us of the legal theory or theories under which the bondholders proceeded against him, it is clear that the bankruptcy of Reclamation District 2090 and the inability of Facilities to meet its obligations supplied the motive both for the bondholders' suits against petitioner and for petitioner's various petitions in his suit against Crist. From all we can glean from *134 this record, the burden of proof falling on petitioner to prove otherwise, we conclude that in 1976 petitioner had just as good a prospect of winning reimbursement from Crist as he had of receiving indemnification from him against the bondholders. Since petitioner does not contend that in 1976 he did not have a claim against Crist for indemnification that offered a reasonable expectation of success, we conclude that petitioner has not carried his burden of proving that in 1976 he had no claim for reimbursement of the loss in issue with respect to which there was a reasonable prospect of recovery. Respondent's determination will therefore be upheld.
To allow petitioners the opportunity to take advantage of respondent's concession that they are entitled to a non-business bad debt loss in 1976, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The plaintiffs sought judgment against Crist of $209,322.70 in special damages, $500,000 in general damages, plus interest, costs and attorney's fees. The original petition was twice amended, on February 20, 1980, and October 17, 1980.↩